UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH

In re:

CASALE MARBLE IMPORTS, INC.

Debtor.
_______________________________/

Case No. 13-21220-EPK
Chapter 11

## MOTION FOR CONVERSION OR DISMISSAL

**COMES NOW**, PNC Bank, N.A., as successor in interest to RBC Bank (USA) ("Lender"), and pursuant to 11 U.S.C. §§ 1112(b) and 1127(b), files this motion to conversion or dismissal, whichever is in the best interests of the creditors and the estate (the "Motion"). In support, Lender states as follows:

## JURISDICTION AND VENUE

1. On May 14, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101 *et. seq*. (the "Bankruptcy Code").

2. Since the Petition Date, the Debtor has remained in possession of its assets and has continued to operate its business as a debtor-in-possession.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## BACKGROUND

4. Debtor is in the business of fabricating and distributing natural stone products.

5. Beginning on March 8, 2005, Lender and Debtor entered into a series of loan agreements pursuant to which Lender extended certain financing to Debtor. Debtor's loan obligations to Lender are secured by liens in favor of Lender on substantially all of the Debtor's assets, including inventory, chattel paper, accounts, equipment, general intangibles, furniture, fixtures, and any related proceeds (the "Collateral").

6. On May 21, 2008, Lender instituted a civil action in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, seeking, among other relief, the appointment of a receiver over the Collateral pending foreclosure (the "2008 State Court Action").

7. The 2008 State Court Action was precipitated by, among other defaults, a $500,000.00 decrease in the overall value of the Collateral in a six week period, in which same period the Debtor used over $1,000,000.00 of the proceeds of the Collateral to pay other creditors in lieu of payments to Lender.

8. On June 11, 2008, after a contested hearing in the 2008 State Court Action, the court entered an order appointing a "Court Monitor" who was empowered to oversee the operations of the Debtor and to ensure that there was no further dissipation of the Collateral.

9. Three days after the appointment of the Court Monitor, on June 14, 2008, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, Case No. 08-19689-PGH (the "Prior Bankruptcy").

10. On June 30, 2010, the Debtor filed its Amended Plan of Reorganization, which provided for a restructuring of its obligations to Lender and for monthly payments to unsecured creditors totaling $810,000.00 and starting in the thirty-seventh month after the effective date (the "2010 Plan")(Prior Bankruptcy Dkt. No. 312).

11. With Plaintiff's consent and support, on August 26, 2010, the Court entered an order confirming the 2010 Plan (the "2010 Confirmation Order")(Prior Bankruptcy Dkt. No. 407).

12. Pursuant to the 2010 Plan, the effective date occurred eleven days after entry of the 2010 Confirmation Order, or September 6, 2010, on which date the 2010 Plan became effective. On October 6, 2013, the thirty-seventh month after the effective date of the 2010 Plan, the Debtor's monthly payments to unsecured creditors are scheduled to begin.

13. Immediately following the effective date, the Debtor commenced monthly payments to the Lender as provided under the 2010 Plan.

14. On January 5, 2011, the Debtor filed its Final Report and Motion for Entry of Final Decree in which it declared that payments had begun under the 2010 Plan and that the 2010 Plan had been substantially consummated (Prior Bankruptcy Dkt. No. 422).

15. On February 7, 2011, the Court entered its Final Decree and closed the case (the "Final Decree")(Prior Bankruptcy Dkt. No. 425).

16. After confirmation of the 2010 Plan, the Lender and Debtor entered into further agreements whereby the Debtor restated and consolidated its obligations to

Lender, and cross-collateralized certain other loan obligations due to Lender from Debtor's affiliates, but Lender did not provide any additional extensions of credit.

17. In the meantime, the Debtor continued to struggle financially. On September 30, 2011, the Debtor and the Lender entered into a First Amendment to Loan Modification Agreement whereby Lender further restructured Debtor's obligations, including an extension of the maturity date. Only days later, on November 3, 2011, the Debtor contacted Lender again requesting further restructuring and further extension of the maturity date as the Debtor's projections were indicating certain default. Lender consented to a restructuring yet again, and, as it turns out, even those negative projections turned out to be far too optimistic, and the Debtor was unable to pay its debts even after multiple restructurings.

18. As of the Petition Date, Lender is owed from Debtor $4,060,488.75 on loans on which Debtor is the primary obligor, and Lender is owed an additional $4,856,618.53 on loans to Debtor's affiliates on which Debtor is secondarily responsible.

19. In sum, as of the Petition Date, the Collateral is subject to liens in favor of Lender securing obligations totaling at least $8,917,107.28.

20. In spite of the restructuring of its debts in the 2010 Plan, the Debtor has not been able to successfully reorganize or rectify the enduring flaws in the Debtor's basic business model.

21. On March 1, 2012, the Debtor defaulted on its restructured obligations to Lender by, *inter alia*, failing to make payments due on March 1, 2012, and all payments due after.

22. As an accommodation to the Debtor, Lender refrained from filing any action for over one year, instead trying to work with the Debtor to find a new investor or to arrange a collaborative and orderly liquidation of the Collateral.

23. During this time, the Debtor made multiple representations to Lender that it understood it had run out of time and money and that the Debtor agreed to an immediate auction of the property. Each time, however, that Lender attempted to secure a final date for an auction from the Debtor, the Debtor failed to follow through.

24. Meanwhile, on May 8, 2013, without notifying Lender, the Debtor entered into a Consignment Agreement and Notice of Retained Ownership of Consigned Inventory and Goods with one of its marble vendors in what appears to be an obvious attempt to circumvent Lender's security interests in the Collateral by holding all inventory in "consignment" while continuing to fund ongoing consignment operations with accounts receivable comprising the Collateral. Lender became aware of this agreement only by independently searching the Florida Secured Transaction Registry and discovering a UCC-1 Financing Statement to which the agreement was attached.

25. On May 10, 2013, Lender filed an action in the District Court, Southern District of Florida, Case No. 9:13-cv-80482-KAM, for, among other relief, appointment of a receiver pending foreclosure of the Collateral.

26. On May 14, 2013, the Debtor filed this bankruptcy, and on May 20, 2013, the Debtor filed its Emergency Motion to Use Cash Collateral (Dkt. No. 25)(the "Cash Collateral Motion"). In the budget attached to the Cash Collateral Motion, the Debtor anticipates a deterioration of Debtor's cash position by almost $75,000.00 over six

months, while, in the meantime, calling for no adequate protection payments to Lender. This confirms the obvious: the Debtor is insolvent, and its business model has failed.

## **MEMORANDUM OF LAW**

"11 U.S.C. § 1112(b) provides authority to dismiss a case for cause." *In re Moog*, 159 B.R. 357, 360 (Bankr. S.D. Fla. 1993). "That section of the Code lists nine non-exclusive grounds for dismissal." *Id.* One ground expressly listed in § 1112 as cause is the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." The list in §1112, however, "is not exhaustive and courts have concluded that a debtor's 'lack of good faith' may also constitute cause for dismissal of a petition under § 1112(b)." *Moog*, 159 B.R. at 360.

Additionally, § 1127(b) provides, in pertinent part, that a "reorganized debtor may modify [its] plan at any time after confirmation of such plan and before substantial consummation of such plan, . . ." Section 1101(2) defines the term "substantial consummation" as follows:

> (2) "substantial consummation" means—
>
> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

The binding effect of a confirmed plan is set forth in § 1141(a) which provides as follows:

> Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder of, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

Moreover, "a plan is binding upon all parties once it is confirmed and all questions which could have been raised pertaining to such plan are *res judicata*." *In re Northampton Corp.*, 37 B.R. 110, 113 (Bankr. E.D. Pa. 1984)(*quoting* 5 Collier on Bankruptcy, ¶ 1141.01 [1] at 1141–5, 1141–6 (15th ed. 1983), *aff'd*, 59 B.R. 963 (E.D. Pa. 1984)). "An order confirming a plan is a judgment *in rem* in the sense that it is a determination of the rights and liabilities created by the plan, binding upon all parties in interest." *Id.* "Further, once a plan has been substantially consummated, 'rights are vested and cannot be modified.' *Id.* (*quoting* 3 Norton Bankruptcy Law and Practice, § 64.02 at 2 (1981)).

According to the court in *Northampton*, in the context of a second chapter 11 filing after a confirmed, substantially consummated plan, "the debtor's present intention to reorganize and the feasibility of any such reorganization are completely irrelevant," and the case should simply be dismissed *per se*, without reference to principles of good faith, as the subsequent filing is merely an improper attempt to circumvent issues that are *res judicata*. *See id.* at 113; *see also In re AT of Maine, Inc.*, 56 B.R. 55, 57 (Bankr. D. Me. 1985)(dismissing a subsequent filing, expressly agreeing with *Northampton* that a

subsequent filing is an improper end-run around principles of *res judicata*, but also dismissing the case based on an independent finding of bad faith).

Other courts, however, have taken a more flexible approach, and viewed the issue through the lens of the good faith doctrine. For instance, in *Matter of Mableton-Booper Associates*, 127 B.R. 941, 943-44 (Bankr. N.D. Ga. 1991), the court acknowledged that "§§ 1127(b) and 1141(a) impose an important element of finality in Chapter 11 proceedings, allowing parties to rely on the provisions of a confirmed reorganization plan." But instead of applying a *per se* rule, Judge Drake allowed for an exception for a second filing when "unexpected circumstances doom the debtor's chances for success," but only when a debtor cannot "anticipate the changed circumstances before confirmation of the first plan." *Id.* The court also made clear that "changed market conditions alone are not sufficiently changed circumstances to warrant a second filing." *Id.* at 944. Finding that the debtor in *Mableton* "did not make a sufficient showing of unanticipated changed circumstances to justify the filing of a new petition," the court found that the "new filing was in bad faith."

Similarly, in *Matter of Savannah, Ltd.*, 162 B.R. 912, 915 (Bankr. S.D. Ga. 1993), the court stated that "[a]lthough there is no *per se* rule against successive filings, a debtor generally should not be permitted to go forward with a successive Chapter 11 reorganization case where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan." According to Judge Davis in *Savannah*, an exception to this general prohibition would only arise when "the

second case is filed in good faith and as a result of unforeseen changed circumstances" and "such circumstances must have been unknown at the time of the substantial consummation of the prior plan, and must have substantially affected the debtor's ability to perform that plan." *Id.* at 915-16. In a subsequent case, Judge Davis also stated that "[a] second filing is normally not permitted over the objection of a creditor whose claim is to be dramatically prejudiced by the filing." *In re Motel Properties, Inc.*, 314 B.R. 889, 897 (Bankr. S.D. Ga. 2004).

In the instant case, the Debtor defaulted on the terms of the 2010 Plan approximately a year and a half after entry of the Confirmation Order. Although the 2010 Plan has been substantially consummated and the Court has entered the Final Decree, the Debtor has yet to make a single payment to its unsecureds under the 2010 Plan, which obligation is scheduled to begin this October. In the meantime, substantially all of the Debtor's assets are subject to Lender's liens securing nearly $9 million in defaulted, accelerated obligations to Lender, and the Lender has not received a payment in over a year.

Whether this Court adopts the *per se* standard of *Northampton* and *AT of Maine*, or the more flexible standard of *Mableton*, *Savannah*, and *Motel Properties*, this case is a improper attempt to restructure debts which have already been restructured, and a violation of the spirit and principles of § 1127, *res judicata*, and the good faith doctrine.

The Debtor's default under the 2010 Plan was not occasioned by an unforeseeable change in circumstances. It was occasioned by the inability of the Debtor to make a profit, a frailty suffered by this Debtor since at least May of 2008 when it first defaulted

on its obligations to Lender. Almost precisely five years after that default, in May of 2013, the Debtor still cannot muster any consistent profits. In fact, since the inception of this loan in 2005, for almost half of that time the Debtor has been either in default or in bankruptcy.

There is no credible argument that things are going to change. As evidenced by the budget attached to the Cash Collateral Motion, even the Debtor's own six-month projection anticipates significant losses and deterioration in its cash position, and that is without making a single payment to Lender. The problems the Debtor had in 2008 are the same problems it has in 2013. Five years later, and it is still paying trade creditors at the expense of Lender and still allowing Lender's collateral base to dissipate while protecting its suppliers and vendors. Even worse, the Debtor has now entered into a questionable "consignment" agreement likely designed with the primary purpose to thwart Lender's rights.

If the Debtor is permitted to continue active business operations, it will continue, by its own admission and as evidenced by its previous practices, to diminish the value of the estate. The Debtor's projection of continued losses, coupled with its prior failure under the 2010 Plan, strongly evidence that there is also no reasonable chance of rehabilitation, and that any additional restructuring of its obligations will be similarly unsuccessful. Whether as a violation of the principles of *res judicata*, as a filing made in bad faith, or on account of the continued diminution of the estate and no likelihood of rehabilitation, this case should be converted or dismissed.

**WHEREFORE,** Lender respectfully requests that this Court enter an order converting this case to chapter 7 or dismissing this case from bankruptcy, whichever is in the best interests of creditors and the estate, together with any further relief this Court deems just and proper.

Dated this 22nd day of May, 2013.

*/s/ Denise D. Dell-Powell*
Denise D. Dell-Powell, Esquire
Florida Bar Number: 0890472
Michael A. Nardella, Esquire
Florida Bar Number: 51265
**BURR & FORMAN LLP**
200 S. Orange Avenue, Suite 800
Orlando, Florida 32801
Phone: (407) 540-6600
Fax: (407) 540-6601
E-mail: ddpowell@burr.com
mnardella@burr.com

**ATTORNEYS FOR**
**PNC BANK, N.A.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 22, 2013, a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following: Debtor: Casale Marble Imports, Inc., 750 SW 17th Avenue, Delray Beach, FL 33444; U.S. Trustee, Office of the U.S. Trustee, 51 S.W. 1st Avenue, Suite 1204, Miami, FL 33130; and by electronic mail to: Debtor's Counsel: Brett A. Elam, Esquire, 105 S. Narcissus Avenue #802, West Palm Beach, FL 33401 (belam@brettelamlaw.com).

*/s/ Denise D. Dell-Powell*
Denise D. Dell-Powell, Esquire